**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

| | |
|---|---|
| ŌURA HEALTH OY, | |
| *Plaintiff,* | **CASE NO. 6:22-cv-00478-ADA** |
| v. | **JURY TRIAL DEMANDED** |
| CIRCULAR SAS, | |
| *Defendant.* | |
| CIRCULAR SAS, | |
| *Counterclaim-Plaintiff,* | |
| v. | |
| ŌURA HEALTH OY, | |
| *Counterclaim-Defendant.* | |

**PLAINTIFF OURA'S**
**RESPONSIVE CLAIM CONSTRUCTION BRIEF**

## TABLE OF CONTENTS

I.      INTRODUCTION ........................................................................................................1

II.     BACKGROUND ..........................................................................................................1

        A.      Plaintiff Oura is a pioneer in smart ring wearables............................................1

        B.      The Asserted Patents ..........................................................................................2

                1.      The '833 Patent .......................................................................................2

                2.      The '429 Patent .......................................................................................3

III.    PERSON OF ORDINARY SKILL IN THE ART....................................................4

IV.     ANALYSIS OF DISPUTED CLAIM TERMS ...........................................................5

        A.      U.S. Patent No. 10,842,429.................................................................................5

                1.      Term No. 1: "using the obtained user's movements to determine a
                        nature of the period, wherein the nature of the period is selected
                        from an activity period and a rest period" ..................................................5

                2.      Term No. 2: "a sleep balance" ................................................................7

                3.      Term Nos 3 and 4: Means-plus-function limitations ...............................10

        B.      U.S. Patent No. 10,893,833.................................................................................14

                1.      Term No. 5: "inner surface".....................................................................14

                2.      Term Nos. 6 and 7: The definite terms ....................................................17

                3.      Term No. 8: "ink" ...................................................................................20

V.      CONCLUSION............................................................................................................20

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abbott Lab'ys v. Baxter Pharm. Prod., Inc.*,
   334 F.3d 1274 (Fed. Cir. 2003)..........................................................................7

*B. Braun Med., Inc. v. Abbott Lab'ys*,
   124 F.3d 1419 (Fed. Cir. 1997)........................................................................12

*Biotec Biologische Naturverpackungen GmbH & Co. v. Biocorp, Inc.*,
   249 F.3d 1341 (Fed. Cir. 2001)........................................................................20

*In re Downing*,
   754 F. App'x 988 (Fed. Cir. 2018) ...............................................................6, 19

*E-Pass Techs., Inc. v. 3Com Corp.*,
   343 F.3d 1364 (Fed. Cir. 2003)..........................................................................8

*Elgin Nursing and Rehab. Ctr. v. U.S. Dep't. of Health & Hum. Servs.*,
   718 F.3d 488 (5th Cir. 2013) .............................................................................9

*Hyperion Sol. Corp. v. Outlooksoft Corp.*,
   422 F. Supp. 2d 760 (E.D. Tex. 2006)...............................................................17

*JVW Enters., Inc. v. Interact Accessories, Inc.*,
   424 F.3d 1324 (Fed. Cir. 2005).....................................................................11, 12

*Kemco Sales, Inc. v. Control Papers Co.*,
   208 F.3d 1352 (Fed. Cir. 2000).......................................................................9, 10

*Kinik Co. v. Int'l Trade Comm'n*,
   362 F.3d 1359 (Fed. Cir. 2004)..........................................................................8

*Markman v. Westview Instruments, Inc.*,
   52 F.3d 967 (Fed. Cir. 1995), aff'd, 517 U.S. 370 (1996).......................................8

*Nature Simulation Sys. Inc. v. Autodesk, Inc.*,
   50 F.4th 1358 (Fed. Cir. 2022) ........................................................................19

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
   572 U.S. 898 (2014)........................................................................................17

*Northrop Grumman Corp. v. Intel Corp.*,
   325 F.3d 1346 (Fed. Cir. 2003)........................................................................10

*Omega Eng'g, Inc., v. Raytek Corp.*,
  334 F.3d 1314 (Fed. Cir. 2003)..................................................................................17

*Oran R. B. v. Kijakazi*,
  No. 3:20-CV-3409-BN, 2022 WL 3974264 (N.D. Tex. Aug. 31, 2022)...................................9

*Pavo Sols. LLC v. Kingston Tech. Co., Inc.*,
  35 F.4th 1367 (Fed. Cir. 2022) ...........................................................................18, 19

*Rehco LLC v. Spin Master, Ltd.*,
  759 F. App'x 944 (Fed. Cir. 2019) ..........................................................................6

*Salazar v. AT&T Mobility LLC*,
  64 F.4th 1311 (Fed. Cir. 2023) ..............................................................................6

*Thorner v. Sony Comput. Ent. Am. LLC*,
  669 F.3d 1362 (Fed. Cir. 2012)..............................................................................16

**Statutes**

35 U.S.C. §112(f)....................................................................................... *passim*

## I.    INTRODUCTION

Defendant's opening *Markman* brief is a case study on how to violate the tenets of claim construction. It is a fundamental principle of patent law that in construing claim terms, the plain and ordinary meaning governs. Deviation from the plain and ordinary meaning is only permitted in two instances: lexicography and disavowal. Yet without identifying a single instance of true lexicography or clear and unmistakable disclaimer, Defendant asks the Court to depart from this simple and longstanding rule.

Defendant's theme of asking the Court to act contrary to claim construction principals continues for the "means for" terms that remain in dispute. Use of the term "means" in a claim limitation creates a presumption that 35 U.S.C. §112(f) has been invoked. And means-plus-function limitations require identification of a claimed function and are limited to corresponding structure disclosed in the specification. But for the means-plus-function limitations in this case, Defendant fails to rebut the presumption while asking the Court to not limit the function to *any* specific structure. Defendant's claim construction positions are wrong in each instance.

## II.    BACKGROUND

### A.    Plaintiff Oura is a pioneer in smart ring wearables.

This case relates to smart wearable rings. Founded in 2013, Oura has been a pioneer in developing a smart ring that allows users to take control of their health. Oura Ring was a culmination of extensive research and development that ignored the conventional focus of counting daily steps as an artificial gauge of users' fitness. Instead, Oura set out to develop a product that accurately provides personalized insight into users' fitness and health by monitoring heart rate, temperature variations, blood oxygen levels, sleep, and movements.

Oura also designed its product in an innovative and user-friendly form factor—i.e., a ring:

1



**Oura Ring**

Unlike wrist wearables, Oura Ring is designed to measure signals directly from the arteries in the finger, rather than the surface capillaries in the wrist. This captures a more accurate signal. Oura Ring design also leverages optical sensors at multiple locations around the circumference of the finger to prioritize the clearest signal capture compared to wrist wearables.

Oura Ring has been embraced by over 1 million users and was featured in TIME magazine as one of the best inventions of 2020. https://time.com/collection/best-inventions-2020/5911381/oura-ring/. Oura Ring was also selected by the National Basketball Association (NBA), the Ultimate Fighting Championship (UFC), and several other organizations to equip their athletes with the most accurate and credible health technology. *See e.g.,* https://www.ufc.com/news/oura-official-health-wearable-ufc-performance-institute.

**B.    The Asserted Patents**

There are two asserted patents: U.S. Patent Nos. 10,893,833 ("'833 patent") and 10,842,429 ("'429 patent"). Ex. A ('833 patent); Ex. B ('429 patent). The '833 patent relates to the physical structure of the ring while the '429 patent relates to the method and system for assessing the readiness score of the user based on biosignals and movements recorded throughout the day by one or more of optical electronics, electrodes, or sensors.

**1.    The '833 Patent**

The '833 patent relates to the structure of a wearable electronic device. *See* Ex. A ('833

patent) at 1:15-19. The "wearable devices are designed in a way such that it is waterproof and provides a smooth skin contact to the wearer." *Id.* at 1:34-36. The conventional method of manufacturing such devices, however, "makes their structure configuration complex due to the involvement of various components such as the first cover, the second cover, the o-ring and the screws." *Id.* at 1:43-47. Additionally, incorporation of multiple parts "may lead to manufacturing defects since the components are made with small tolerances." *Id.* at 1:47-55.

The claimed invention of the '833 patent "provides a wearable electronic device having a simple structure configuration and efficient waterproofing." *Id.* at 2:25-29. In contrast to using various components such as multiple covers, o-ring, and screws, the '833 patent discloses manufacturing the wearable electronic device with a molded body part made of non-ceramic material (e.g., plastic, metal, rubber or combination) that is molded to form at least one cavity on the inner surface of the body to house electronic parts (e.g., electronic elements such as battery, microcontroller, flexible printed circuit board, infrared (IR) transmitter, IR receiver, a radio frequency (RF) transceiver, temperature sensor etc.). *Id.* at 4:21-30; 6:62-66; 10:38-65; Fig. 3. The '833 patent also discloses including "a coating . . . made of a moldable filler material such as an epoxy material . . . . [that] is arranged on the inner surface . . . of the molded body part 102 for covering the electronic part 310 and the cavity . . . ." *Id.* at 11:5-10.

Independent claim 1 of the '833 patent is the sole asserted independent claim.

### 2. The '429 Patent

The '429 patent "relates to analysing and processing data related to physical activities and biological signals of an individual, and more specifically, to a method and a system for assessing readiness score of a user." Ex. B ('429 patent) at 1:6-10. Conventional systems were designed based on a misunderstanding that users' physical activity (e.g., counting steps) alone was indicative of user's overall health. The inventors of the '429 patent, however, recognized

that calculating a user's activity as an artificial gauge of that user's health is a flawed process.

Indeed, an "individual is subjected to various kinds of mental and physical loads in a day-to-day life. For example, an individual may be subjected to physical loads (such as physical exercise, walking, driving, playing and the like) and mental loads (such as inappropriate sleep, inappropriate rest, stress and the like)." *Id.* at 1:13-19. "Further, if such mental and physical loads are not managed or handled efficiently, it may induce mental and physical stresses. For example, the physical stress may cause health issues such as backache, spine problems and the like, and the mental stress may cause reduction in sleep . . . ." *Id.* at 1:19-24.

Thus, the '429 patent recognized that "it is important to analyse how an individual manages or handles such mental and physical loads for maintaining a good physical and mental health and what is the readiness of the individual to face further challenges." *Id.* at 1:24-28. To overcome the drawbacks of the conventional systems that failed to "provide any information which relates to recovery of the individual from mental or physical loads that the individual is subjected to," (*id.* at 1:29-35), the '429 patent discloses a method and system for measuring readiness of the user that "covers the effects of earlier physical activity, previous night's sleep, and body responses measured" over a period of time. *Id.* at 4:46-48. The measurements are obtained by a wearable electronic device. *Id.* at 5:4-13; 5:15-18.

Claims 1 and 8 of the '429 patent are the asserted independent claims.

## III. PERSON OF ORDINARY SKILL IN THE ART

Claims are interpreted from the perspective of a hypothetical person of ordinary skill in the art (POSITA). For the '429 patent, a POSITA would have (1) at least three years of experience focused on human physiology and data analytics, and (2) a related degree (e.g., at least a bachelor's degree) in data science, analytics, or human physiology. For the '833 patent, a POSITA would have (1) at least three years of experience with research or development of

4

health or medical devices, and (2) a related degree (e.g., at least a bachelor's degree) in mechanical, industrial, or electrical engineering. A POSITA could have also worked as part of a multidisciplinary team that would have drawn upon not only his or her own skills, but also taken advantage of specialized skills of others on the team.

## IV.    ANALYSIS OF DISPUTED CLAIM TERMS

There are eight (8) disputed terms. Six of the disputed terms require no construction because they are self-explanatory. The remaining two, which are means-plus-function limitations (Term Nos. 3 and 4), only require the identification of corresponding structure.

### A.    U.S. Patent No. 10,842,429

**1.    Term No. 1: "using the obtained user's movements to determine a nature of the period, wherein the nature of the period is selected from an activity period and a rest period"**

| Term No. 1 | Plaintiff's Proposal | Defendant's Proposal |
|---|---|---|
| "using the obtained user's movements to determine a nature of the period, wherein the nature of the period is selected from an activity period and a rest period"<br><br>Cl. 1 and 8. | No construction is necessary.<br><br>This phrase is self-explanatory within the context of the claim, and therefore should receive its plain and ordinary meaning. This term is also not indefinite.<br><br>**Alternative Proposal:**<br><br>"based on the collected data regarding the user's movements, identifying a period of time when the user is at rest *or* a period of time when the user is active." | Indefinite<br><br>OR<br><br>"based on the collected data regarding the user's movements, identifying a period of time when the user is at rest and a period of time when the user is active." |

Defendant first improperly argues that Term No. 1 is indefinite, alleging an inconsistency between the disputed term and the rest of the claim. Defendant argues that while Term No. 1 "allows for determination of *either* an activity period *or* a rest period, [] subsequent steps of the

5

claimed methods require that **both** an activity period and a rest period be determined." Def. Br. at 4 (emphasis in original). But the Defendant ignores that the disputed term captures the concept of using "the user's movements . . . to determine whether the user is active or resting, i.e. to select the nature of the period." Ex. B ('429 patent) at 5:15-29. As explained in the specification, the "'activity period' . . . refers to those periods of a day when the user is subjected to any physical activity, such as when the user is exercising, walking, playing" whereas "'rest period' . . . relates to a sleeping period of the user in a day" or "when the user is sitting or lying down to relax." *Id.* at 5:20-26. Thus, a user might have both active and rest periods through the course of an entire day. But at any one instance of time, the user is either active or resting. The specification confirms this by explaining that "the step of measuring or obtaining the user's movements provides movement data . . . is typically used to determine ***whether a moment of time belongs to the activity period or the rest period*** . . . ." *Id.* at 5:30-39 (emphasis added). And the claims capture this concept. The mere fact that other portions of the claim refer to both activity and rest periods does not render the phrase indefinite.

In addition to misunderstanding the disclosed subject matter, Defendant's argument is also premised on misapplication of the law. Defendant states that "the use of the definite article 'the' in this term means that this limitation refers to a singular 'period' . . . ." Def. Dr. at 5. But the Federal Circuit has repeatedly emphasized that "use of definite articles 'the' or 'said' in a claim . . . does not change the general plural rule, but simply reinvokes that non-singular meaning." *Rehco LLC v. Spin Master, Ltd.*, 759 F. App'x 944, 949 (Fed. Cir. 2019); *Salazar v. AT&T Mobility LLC*, 64 F.4th 1311, 1315 (Fed. Cir. 2023) (same). Thus, the claim is not limited to a singular "period." Nor is a lack of antecedent basis in a claim fatal if the claim can still be construed, which is the case here. *In re Downing*, 754 F. App'x 988, 996 (Fed. Cir. 2018). A

POSITA would understand that "activity period" and "rest period" are associated with the phrase "the nature of the period." Ex. B at 5:15-29. Simply put, Defendant's position is baseless.

Defendant also proposes an alternative construction in lieu of indefiniteness. Def. Br. at 6-7. But the alternative construction seeks to rewrite a Markush-type claim limitation (i.e., "wherein the nature of the period is selected from an activity period and a rest period") to a non-Markush format without affording it the appropriate claim scope. *Abbott Lab'ys v. Baxter Pharm. Prod., Inc.*, 334 F.3d 1274, 1280 (Fed. Cir. 2003) ("A Markush group is a listing of specified alternatives of a group in a patent claim, typically expressed in the form: a member selected from the group consisting of A, B, and C."). If rewritten, the "nature of the period" limitation should be properly construed to be either an activity period *or* a rest period. *Id.* ("if 'wherein R is a material selected from the group consisting of A, B, C and D' is a proper limitation then 'wherein R is A, B, C *or* D' shall also be considered proper.") (emphasis added).[1] Yet Defendant asks this Court to rewrite the claim limitation requiring the "nature of the period" at any one time to be *both* an activity period and a rest period. Defendant's proposal is improper.

The Court should decline to construe this term because it has a plain and ordinary meaning or adopt Plaintiff's alternative proposal.

2. **Term No. 2: "a sleep balance"**

| Term No. 2. | Plaintiff's Proposal | Defendant's Proposal |
|---|---|---|
| "a sleep balance"<br><br>Cl. 5. | No construction is necessary. This phrase is self-explanatory within the context of the claim, and therefore should receive its plain and ordinary meaning. | "the sum of how much accumulated sleep over the previous weeks differs from individual sleep needs" |

---

[1] In the interest of narrowing the dispute, Plaintiff is amenable to Defendant's proposed claim construction that rewrites the disputed phrase to a non-Markush format so long as the proposed construction accurately captures that the nature of the period is *either* an activity period *or* a rest period as outlined in Plaintiff's alternative proposal.

Under the guise of "lexicography," Defendant seeks to import examples of preferred embodiments as a special definition for the term "sleep balance." But the portion of the specification that Defendant relies upon is providing *examples* of a preferred embodiment—not a list of definitions—that discloses how sleep balance could be calculated. Ex. B ('429 patent) at 12:1-4. This section of the specification starts with: "Some examples . . . are listed below." *Id.* at 11:63-65. For "sleep balance" (i.e., sleep debt), the specification explains that one way to track the user's sleep balance includes measuring "the sum of how much accumulated sleep over past 1-3 weeks differs from individual sleep needs" because "insufficient sleep results in sleep debt that reduces daily readiness." *Id.* at 12:1-4.

Defendant, however, improperly equates the preferred example of calculating the sleep balance as alleged evidence of the inventor acting as his own lexicographer. *See* Def. Br. at 8. But the courts have emphasized that "any special definition given to a word must be ***clearly defined in the specification***." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995), aff'd, 517 U.S. 370 (1996) (emphasis added). And "in determining whether a statement by a patentee was intended to be lexicographic, it is important to determine whether the statement was designed to define the claim term or to describe a preferred embodiment." *E-Pass Techs., Inc. v. 3Com Corp.*, 343 F.3d 1364, 1369 (Fed. Cir. 2003). Here, the specification is referring to an example of one way to calculate sleep balance, rather than the *definition* of sleep balance. Defendant's request to restrict the definition to one specific example is improper. *See Kinik Co. v. Int'l Trade Comm'n*, 362 F.3d 1359, 1364-65 (Fed. Cir. 2004) ("[W]hen the specification describes the invention in broad terms, accompanied by specific examples or embodiments, the claims are generally not restricted to the specific examples or the preferred embodiments unless that scope was limited during prosecution.") (internal citations omitted).

Defendant's proposal also defies basic grammar. Defendant's cited section includes three independent (but related) sentences that are each separated by a semicolon evidencing that what follows the semicolon is not a definition of "Sleep balance":

> Sleep balance (sleep debt)**:** the sum of how much accumulated sleep over past 1-3 weeks differs from individual sleep needs**:** insufficient sleep results in sleep debt that reduces daily readiness.

Ex. B ('429 patent) at 12:1-4 (emphasis added); *See Elgin Nursing and Rehab. Ctr. v. U.S. Dept. of Health & Hum. Servs.*, 718 F.3d 488, 494-95 (5th Cir. 2013) ("Clauses separated by a semicolon 'are presumed to be independent clauses.'") (internal references omitted). If the inventor had intended to define "sleep balance," the inventor would have used a colon. *Oran R. B. v. Kijakazi*, No. 3:20-CV-3409-BN, 2022 WL 3974264, at *4 (N.D. Tex. Aug. 31, 2022) ("A colon serves primarily to introduce a quotation, saying, question, explanation, or list."). In ignoring the grammar of the specification, Defendant is falsely equating an example parameter calculation as a definition. This is further evidenced by the fact that other parameters discussed in the same section cited by the Defendant are also not definitions of those respective parameters. For example, the next parameter discussed is "Previous day (physical activity);". Ex. B at 12:5-9. A POSITA would recognize that the definition of the term "previous day" is not "excess sedentary time, excess vigorous intensity and excess total volume of physical activity reduces daily readiness," which is the language directly following the semicolon. *Id*. Neither is the preferred method of calculating sleep balance a definition for the term "sleep balance."

In sum, Defendant is mistaken that the '429 patent specification provides an express lexicography for "sleep balance." The disputed phrase has a plain and ordinary meaning.

3.      <u>**Term Nos 3 and 4**</u>: Means-plus-function limitations

The word "means" in a claim raises a rebuttable presumption that a means-plus-function limitation is invoked under 35 U.S.C. §112(f). *Kemco Sales, Inc. v. Control Papers Co.*, 208 F.3d 1352, 1361 (Fed. Cir. 2000). The presumption may be rebutted only "if the properly construed claim limitation itself recites sufficiently definite structure to perform the claimed function." *Id.* Term No. 3 recites "***means for*** measuring at least one biosignal of the user." Ex B ('429 patent) at 25:41-43 (emphasis added). Term No. 4 recites "***means for*** measuring the user's movements during an activity period and the rest period[.]" *Id.* at 26:1-2 (emphasis added). And neither limitation includes sufficient structure to overcome the presumption. Indeed, during prosecution of the '429 patent, the Patent Office interpreted these two limitations as invoking §112(f). Ex. C at 3-4 and 11-13.[2] Defendant does not proffer any argument against the presumption that the two terms are governed by §112(f). *See* Def. Br. at 8-11. Therefore, the Court should find that the terms are indeed means-plus-function limitations.

"In construing a means-plus-function limitation, a court ***must*** identify both ***the claimed function*** and ***the corresponding structure*** in the written description for performing that function." *Northrop Grumman Corp. v. Intel Corp.*, 325 F.3d 1346, 1350 (Fed. Cir. 2003) (emphasis added). Defendant, however, does not put forth any proposal on the claimed function or the corresponding structure. Instead, Defendant argues that there may be a number of structures to perform the function, and therefore the Court should simply ignore its obligation to identify any structure. This is improper and is dispositive in favor of Plaintiff's proposal. What's more, however, is that Plaintiff's proposal properly identifies the structure linked to the claimed function. Plaintiff's structure should thus be adopted.

---

[2] The Patent Office separately determined that dependent claims 11 and 12 that further limit the "means for" limitation did not invoke §112(f) because those claims recited sufficient structure.

### a.    Term No. 3: "means for measuring at least one biosignal of the user"

| Term No. 3 | Plaintiff's Proposal | Defendant's Proposal |
|---|---|---|
| "means for measuring at least one biosignal of the user"<br><br>Cl. 8. | Governed by 35 U.S.C. §112(f).<br><br>**Claimed Function:**<br><br>"measuring at least one biosignal of the user."<br><br>**Corresponding Structure:**<br><br>"one or more of optical electronics, electrodes, or temperature sensor." | No construction needed. |

"In order to qualify as corresponding, the structure must not only perform the claimed function, but the specification must clearly associate the structure with performance of the function." *JVW Enters., Inc. v. Interact Accessories, Inc.*, 424 F.3d 1324, 1332 (Fed. Cir. 2005). Defendant acknowledges that the specification of the '429 patent identifies one or more of optical electronics, electrodes, or temperature sensors as specific structures to measure the biosignal. Def. Br. at 8-9 ("electrocardiograms are known in the art to be measured by **a pair of electrodes** [citing '429 patent at 6:61-67, cl. 13], and photoplethysmograms can be measured using **optical electronics** . . . [citing *id.* at 7:15-25].");*see also* '429 patent at 7:37-39 ("Body temperature of the user is typically measured using a **sensor for measuring temperature** comprised in the device, for example a thermometer included in the ring."). Emphasis added. Thus, Defendant concedes, at least in part, that Plaintiff's proposed structure is accurate. The additional structure that Defendant alleges is missing from Plaintiff's proposal is a "thermistor." Def. Br. at 9. But a thermistor is simply a type of temperature sensor.[3]

Defendant's opposition appears to be that there might be other "standard ways to measure

---

[3] https://en.wikipedia.org/wiki/Thermistor.

those biosignals known in the art" that could perform the claimed function. Def. Br. at 9. As such, Defendant argues that "[t]his broad array of options relating to biosignals in the specification makes clear that the important limitations of this element of claim are ***that*** a biosignal is capable of being measured, not ***how*** it is measured." *Id.* (emphasis in original). But *how* the claimed function is performed is part of identifying *what* structure performs the claimed function under §112(f). *B. Braun Med., Inc. v. Abbott Lab'ys*, 124 F.3d 1419, 1424 (Fed. Cir. 1997) ("Section 112, paragraph 6 states that a means-plus-function claim '***shall be construed*** to cover the corresponding structure . . . .' This duty to link or associate structure to function is the *quid pro quo* for the convenience of employing § 112, ¶6.") (emphasis added).

Whether there might be "standard ways to measure those biosignals known in the art" (Def. Br. at 9) is irrelevant because a means-plus-function clause does not embrace all structures disclosed in the written description or in the art, but as §112(f) dictates, it only embraces the "corresponding structure" of the recited means, *i.e.* the structure disclosed in the written description and affirmatively identified as accomplishing the claimed function. *JVW Enterprises,* 424 F.3d at 1332. Here, the disclosed corresponding structure for "measuring at least one biosignal of the user" is "one or more of optical electronics, electrodes, or temperature sensor." Plaintiff's proposal accurately captures the corresponding structure for performing the claimed function. Defendant's request that the Court effectively leave the corresponding structure open-ended is contrary to the statutory requirements of §112(f).

    **b.**    <u>**Term No. 4**</u>**: "means for measuring the user's movements during an active period and the rest period"**

| Term No. 4 | Plaintiff's Proposal | Defendant's Proposal |
|---|---|---|
| "means for measuring the user's movements during an active period and the | Governed by 35 U.S.C. §112(f). <br><br> <u>**Claimed Function**</u>: | "means for collecting data regarding the user's movements during an activity |

| Term No. 4 | Plaintiff's Proposal | Defendant's Proposal |
|---|---|---|
| rest period"<br><br>Cl. 8 and 9. | "measuring the user's movements"<br><br>**Alternate Claimed Function**:<br><br>"collecting data regarding the user's movements during an activity period and during the rest period"<br><br>**Corresponding Structure**:<br><br>"at least one motion sensor." | period and during the rest period." |

Term No. 4 is also a means-plus-function limitation invoking 35 U.S.C. §112(f). Defendant offers no position on whether it disputes that this term should be governed under §112(f). Instead, Defendant focuses on the term "measuring" within the phrase and proposes that "measuring" means "collecting data." Def. Br. at 10. Thus, the parties' dispute appears to be entirely different. While Plaintiff is seeking construction of a means-plus-function limitation by identifying the claimed function and corresponding structure under §112(f), Defendant appears to focus on rewriting the claim limitation to construe the phrase "measuring the user's movements."

Turning first to Defendant's argument on "measuring the user's movement," although Plaintiff disagrees that that the term "measuring" needs any construction, Plaintiff is amenable to adopting Defendant's proposal as the claimed function, as reflected in Plaintiff's alternate claimed function. Thus, this moots Defendant's argument on the issue of "measuring."

Turning next to Defendant's opposition to Plaintiff's proposed structure, Defendant acknowledges that the specification of the '429 patent links the step of measuring the user's movements to the "motion sensor" that the specification explains can include an "accelerometer, a gyroscope, a magnetic field sensor or a combination thereof[.]" Def. Br. at 10 (citing '429 patent at 7:1-4, 17:62-44). Yet, without any explanation and only relying on attorney arguments,

Defendant argues that the proposed structure cannot be limited to "at least one motion sensor" because the term "motion sensor" is somehow ambiguous. *Id.* at 10. But Defendant provides no evidence of why a motion sensor would be ambiguous to a POSITA in light of the specification. The specification of the '429 patent clearly explains that a "motion sensor is configured to generate motion data that is indicative of the movements of the user. For example, the motion sensor may be configured to determine linear motion information, rotational motion information, and the like." '429 patent at 7:4-8. Thus, a POSITA would readily understand the scope of a motion sensor in light of the specification.

Defendant's remaining argument that a "POSA would also know that a user can obtain motion information in other ways" (Def. Br. at 11), is again meritless because a means-plus-function clause does not embrace all structures disclosed in the written description or in the art, but only the "corresponding structure" and equivalents. Here, the claimed function of "measuring the user's movements" is performed by "at least one motion sensor."

**B.    U.S. Patent No. 10,893,833**

**1.    Term No. 5: "inner surface"**

| Term No. 5 | Plaintiff's Proposal | Defendant's Proposal |
|---|---|---|
| "inner surface"<br><br>Cl. 1. | No construction is necessary.<br><br>This phrase is self-explanatory within the context of the claim, and therefore should receive its plain and ordinary meaning." | "surface of the wearable electronic device that, when the device is worn, is in contact with the skin of the user and not externally visible" |

The term "inner surface" appears in independent claim 1 in the following context:

1.    A wearable electronic device comprising:

a body part made of a non-ceramic material, having an **inner surface** and an outer surface, wherein at least one cavity is

14

> formed on the ***inner surface*** of the body part, the at least one cavity extending from the ***inner surface*** of the body part towards the outer surface of the body part and having a depth arranged within the ***inner surface*** of the body part . . . .

Ex. A ('833 patent) at 14:15-28 (emphasis added).

"Inner surface" has a plain and ordinary meaning. Defendant acknowledges that the specification of the '833 patent, in conjunction with the figures, explains what is envisioned by "inner surface." Def. Br. at 11. Indeed, the '833 patent, with reference to below figures, discloses that "the molded body part **102** is configured to have a shape of ring that can be suitably worn on a finger of the user. The molded body part **102** includes an inner surface **110** and an outer surface **112** opposite to the inner surface **110**." Ex. A, ('833 patent) at 10:16-20 (emphasis added).



'833 patent at Fig. 1 (annotated)          '833 patent at Fig. 3 (annotated)

The '833 patent also illustrates the structure of the wearable device and its components from a cross-sectional view. *Id.* at 11:30-33 ("the FIGS 4 and 5 illustrate cross-sectional views of the loop 122 of the molded body part 102 along the axes A-A and C-C, respectively. The molded body part 102 includes outer surface **112**, the inner surface **110** and the cavity . . . .") (emphasis added).

15



FIG. 4          FIG. 5

*Id.* at Figs. 4 and 5 (annotated). Thus, a POSITA would readily understand the meaning of "inner surface" in light of the specification and the figures of the '833 patent. Nonetheless, Defendant argues that "such labeling may not be clear if the embodiment is something other than a ring." Def. Br. at 11. But Defendant does not explain *why* a POSITA would be confused about the meaning of "inner surface." As described and shown above, "inner surface" is simply a surface opposite to the "outer surface." Ex. A, ('833 patent) at 10:16-20. And any wearable device outside of a ring form factor (e.g., a watch or chest strap) would also have an inner surface that is opposite of the outer surface.

Defendant's proposed construction is also not supported by lexicography or disavowal in the intrinsic record. *See Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012). Defendant's overly narrow and flawed construction requires that the inner "surface of the wearable electronic device. . . is in contact with the skin of the user ***and not externally visible***." As support for this construction, Defendant cites to the specification that states that "the *outer* surface is opposite to the inner surface *and externally visible*." *Id.* at 4:23-25 (emphasis added). But simply because an outer surface is externally visible does not necessarily mean that the inner surface is not externally visible. This is a classic case of flawed logic that relies on false

inferences. Defendant's insertion of a negative limitation (i.e., "not externally visible") is also improper absent "express disclaimer or independent lexicography in the written description that would justify adding that negative limitation." *Omega Eng'g, Inc, v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003); *See Hyperion Sol. Corp. v. Outlooksoft Corp.*, 422 F. Supp. 2d 760, 773 (E.D. Tex. 2006) ("Importing a negative limitation into a claim, particularly where the claim language does not contain such a limitation, is generally not favored."). Neither the specification nor the claim language suggests that the inner surface cannot be externally visible. Simply put, "inner surface" is a term that would be easily understood by a POSITA and has a plain and ordinary meaning. The Court need not entertain Defendant's attempt to add complexity to an otherwise simple term.

### 2. <u>Term Nos. 6 and 7</u>: The definite terms

| Term Nos. 6 and 7 | Plaintiff's Proposal | Defendant's Proposal |
|---|---|---|
| "the cavity a bottom of the cavity"<br><br>Cl. 6. | "the at least one cavity at a bottom of the at least one cavity" | Indefinite |
| "a bottom of the at least one cavity"<br><br>Cl. 7. | "the bottom of the at least one cavity" | Indefinite |

Defendant fails to prove with clear and convincing evidence that dependent claims 6 and 7 of the '833 patent are invalid as indefinite. The Supreme Court has held that a patent is invalid for indefiniteness only "if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014). Dependent claim 6 recites:

>      6.    The wearable electronic device according to claim **1**,

> wherein the electronic part is ***attached to the cavity a bottom of the cavity***.

'833 patent at 14:40-43 (emphasis added). And dependent claim 7 recites:

> 7.    The wearable electronic device according to claim **6**, comprising one or more of a sticker, a tape or glue that attaches the electronic part to ***the at least one cavity at a bottom of the at least one cavity***.

*Id.* at 14:43-46 (emphasis added).

Dependent claim 6 includes two minor typographical errors: (1) the claim limitation references "the cavity" instead of "the at least one cavity," and (2) the word "at" is missing before the phrase "a bottom of the at least one cavity."[4] Defendant argues that dependent claim 6 (Term No. 6) is indefinite due to the typographical errors (Def. Br. at 13) and dependent claim 7 (Term No. 7) is indefinite solely due to its dependency from claim 6 (Def. Br. at 14).

A district court, however, may correct "obvious minor typographical and clerical errors in patents." *Pavo Sols. LLC v. Kingston Tech. Co., Inc.*, 35 F.4th 1367, 1373 (Fed. Cir. 2022). Correction is appropriate "if (1) the correction is not subject to reasonable debate based on consideration of the claim language and the specification and (2) the prosecution history does not suggest a different interpretation of the claims." *Id.* Both are true here. The specification of the '833 patent explains that "the electronic part is attached to the cavity by an attachment means arranged ***at a bottom of the cavity*** . . . . In an example, a sticker (or a stick foam tape) may be arranged ***at a bottom of the first cavity*** and the battery may be adhered to central portion . . . . Similarly, another sticker (or a stick foam type) may be arranged ***at a bottom of the second cavity*** . . . ." Ex. A at 5:14-25 (emphasis added). And during prosecution, the Patent Office also understood the meaning of the term in dependent claims 6 and 7. *See* Ex. D at 4-5.

---

[4] Dependent claim 7 does not have the same typographical errors, and instead correctly recites "at a bottom of the at least one cavity." *Id.*

18

The error is also clear from the full context of the claims. *Pavo Sols.*, 35 F.4th at 1374. Both independent claim 1 (from which claim 6 depends) *and* dependent claim 7 (which depends from claim 6) correctly recite "at least one cavity" for any reference to a cavity. *See e.g.,* Ex. A at 14:15-27 ("at least one cavity is formed[,]" "the at least one cavity extending from the inner surface[,]" "an electronic part arranged in said at least one cavity"); 14:43-46 ("one or more of a sticker, a tape or glue that attaches the electronic part to the at least one cavity at a bottom of the at least one cavity"). Thus, a POSITA would understand that dependent claim 6 was referring to the "at least one" cavity. [5]

There is also no reasonable debate that claim 6 intended to include the word "at" prior to the phrase "a bottom of the cavity." Independent claim 1 specifically states that "an electronic part [is] arranged in said at least one cavity[.]" *Id.* at 14:15-27. Dependent claim 7 recites alternative options (i.e., one or more of a sticker, a tape or glue) that are used to "attach[] the electronic part to the at least one cavity ***at a bottom of the at least one cavity***." *Id.* at 14:43-46 (emphasis added). And the specification makes clear that the electronic part is attached "***at*** a bottom of the cavity." Thus, a POSITA would understand that the missing "at" in claim 6 was nothing more than a typographical error based on full context of the claims and the specification. *Nature Simulation Sys. Inc. v. Autodesk, Inc.*, 50 F.4th 1358, 1364 (Fed. Cir. 2022) ("'Claim language, standing alone' is not the correct standard of law and is contrary to uniform precedent."). So long as there is "reasonable certainty" of the claim scope, the claims are held valid. *Id.* Here, the minor typographical and clerical errors are evident from the face of the patent and the Court can correct the errors. In sum, both dependent claims 6 and 7 are valid.

---

[5] Separate from an obvious typographical error, even a lack of a proper antecedent basis in a claim is not fatal if the claim can be construed which is the case here. *In re Downing*, 754 F. App'x at 996.

### 3.    <u>Term No. 8: "ink"</u>

| Term | Plaintiff's Proposal | Defendant's Proposed |
|------|----------------------|----------------------|
| "ink"<br><br>Cl. 10 | No construction is necessary. This term is self-explanatory within the context of the claim, and therefore should receive its plain and ordinary meaning. | "colorant" |

The term "ink" is recited in dependent claim 10 in the following context:

> 10.    The wearable electronic device according to claim **9**, wherein the moldable filler material comprises ***an ink*** and is configured to cover at least an area other than the infrared transmitter and the infrared receiver within the at least one cavity.

Ex. A ('833 patent) at 14:59-63 (emphasis added). The specification explains that an ink is part of the moldable filler material of the device, which increases the amount of "infrared light which can pass thru the moldable filler material with the ink compared to amount of visible light . . . ." *Id.* at 5:63-6:3. The purpose is to maximize reception of the infrared light for improved signal quality while minimizing the amount of visible light that penetrates the moldable filler material. *Id.*

Defendant's proposed construction simply substitutes the word "ink" for "colorant." Def. Br. at 14-15. Defendant does not contend that the term "ink," as claimed, is ambiguous. *Id.* Nor does Defendant suggest that the word "colorant" would provide more clarity to the claim. *Id.* Instead, it appears that Defendant seeks construction here simply for the sake of construing. But when a term has an ordinary lay meaning, no construction is required. *See Biotec Biologische Naturverpackungen GmbH & Co. v. Biocorp, Inc.*, 249 F.3d 1341, 1349 (Fed. Cir. 2001). For this reason, Plaintiff submits that the term needs no construction as it is self-explanatory.

## V.    CONCLUSION

For the foregoing reasons, Plaintiff's constructions should be adopted.

DATED: November 28, 2023

Respectfully submitted,

*/s/ Shaun W. Hassett, with permission for*
*Jasjit S. Vidwan*
Michael E. Jones, State Bar No. 10929400
Shaun W. Hassett, State Bar No. 24074372
**POTTER MINTON**
102 North College, Suite 900
Tyler, TX 75702
Tel: 903.597.8311
mikejones@potterminton.com
shaunhassett@potterminton.com

**ARENTFOX SCHIFF LLP**
Janine A. Carlan (*pro hac vice*)
Jasjit S. Vidwan (*pro hac vice*)
1717 K Street, NW
Washington, DC 20006-5344
Tel: 202.857.6000
janine.carlan@afslaw.com
jasjit.vidwan@afslaw.com

*ATTORNEYS FOR PLAINTIFF ŌURA HEALTH OY*